Filed 3/16/22 (unmodified opn. attached)
CERTIFIED FOR PUBLICATION

COURT OF APPEAL -- STATE OF CALIFORNIA
FOURTH DISTRICT
DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br>        Plaintiff and Respondent,<br><br>        v.<br><br>JODY ANN CLEMENTS,<br>    Defendant and Appellant. | E073965<br><br>(Super.Ct.No. SICRF1989169810)<br><br>The County of Inyo<br><br>ORDER MODIFYING OPINION<br>AND DENYING PETITION FOR<br>REHEARING<br>[No Change in Judgment] |

THE COURT

The petition for rehearing is denied. The Opinion filed in this matter on February 16, 2022, is modified to add the following after the last paragraph prior to the disposition:

Clements argues in a petition for rehearing that we should review the trial judge's ruling independently, rather than for substantial evidence, because his inquiry was limited to a cold record—the trial transcript and prior appellate decision—without observation of live testimony. She points out correctly that the trial judge did not preside over the original trial in this matter, which occurred before he took the bench. She argues under these circumstances the trial judge has no advantage over us when making factual findings, and that we should not defer to his findings. However, our Supreme Court has held in the context of a Proposition 36 petition for recall of sentence that "even if the trial

1

court is bound by and relies solely on the record of conviction to determine eligibility, [where] the question . . . remains a question of fact . . . we see no reason to withhold the deference generally afforded to such factual findings." (*People v. Perez* (2018) 4 Cal.5th 1055, 1066.)

Clements relies on *People v. Vivar* (2021) 11 Cal.5th 510, 524 (*Vivar*). In *Vivar*, our Supreme Court held we should conduct an independent review when evaluating a trial judge's decision whether to vacate a conviction under a recently enacted statute offering relief to people who have already served their sentences but face deportation or other negative immigration consequences due to the conviction. (§ 1473.7.) "A successful section 1473.7 motion requires a showing, by a preponderance of the evidence, of a *prejudicial* error that affected the defendant's ability to meaningfully understand the actual or potential immigration consequences of a plea." (*Vivar*, at p. 517.) In choosing independent review in this context, the Court emphasized that the questions raised by a 1473.7 motion, "while mixed questions, are predominantly questions of law." (*Vivar*, at p. 524.) By contrast, the question whether Clements acted with reckless indifference to human life is predominantly a factual determination. We conclude that *Perez*, not *Vivar*, governs in the circumstances of Clements' appeal.

We note that the Supreme Court emphasized in *Vivar* that the "embrace of independent review in this context is a product of multiple factors with special relevance here: the history of section 1473.7, the interests at stake in a section 1473.7 motion, the type of evidence on which a section 1473.7 ruling is likely to be based, and the relative

competence of trial courts and appellate courts to assess that evidence." (*Vivar*, *supra*, 11 Cal.5th at p. 527.) The same factors don't support applying independent review in the context of reviewing a trial judge's ruling after a full hearing under section 1170.95 subdivision (d)(3).

Except for the modification, which doesn't affect the judgment, the opinion is unchanged.

CERTIFIED FOR PUBLICATION

SLOUGH
J.

We concur:

CODRINGTON
Acting P. J.

FIELDS
J.

Filed 2/16/22; Opinion on transfer from Supreme Court (unmodified opinion)

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E073965 |
| v. | (Super.Ct.No. SICRF1989169810) |
| JODY ANN CLEMENTS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Inyo County. Brian Lamb, Judge. Affirmed.

Reed Webb, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Robin Urbanski and Meredith S. White, Deputy Attorneys General, for Plaintiff and Respondent.

1

In 1989, after appellant Jody Ann Clements solicited her ex-husband and her boyfriend to assault her 16-year-old brother, the two killed the brother by stabbing him and bludgeoning him with a rock and then buried his body in the desert. A jury convicted Clements of second degree murder in 1990 after the trial judge instructed them on both natural and probable consequences and implied malice theories of murder.

In 2018, the Legislature enacted Senate Bill No. 1437 (2017-2018 Reg. Sess.) (SB 1437), which, among other things, amended the definition of murder to eliminate the natural and probable consequences doctrine. (Pen. Code, §§ 188, subd. (a)(3); 189, subd. (a), unlabeled statutory citations refer to this code.) The Legislature also added a new provision to the Penal Code, which establishes a procedure for vacating murder convictions predating the amendment if they could not be sustained under the amended definition of murder. (§ 1170.95; Stats. 2018, ch. 1015, § 4.)

Clements filed a petition arguing she was convicted of second degree murder under a natural and probable consequences theory and could not be convicted under the current law. After a hearing, at which the parties agreed to limit the evidence to the record of conviction, the trial judge looked to our decision in Clements' original appeal and other portions of the record of conviction and made two alternative determinations that: (1) substantial evidence supported the determination that Clements could have been convicted of second degree murder under an implied malice theory and (2) Clements in fact committed implied malice second degree murder beyond a reasonable doubt. The trial judge therefore denied her petition on each of these independent, adequate grounds.

2

Clements argues the trial judge erred by considering this court's opinion in her original appeal, by misconstruing the nature of the eligibility determination it was required to make under the new statute, and by denying her petition in the absence of substantial evidence supporting a finding of implied malice.

We hold an appellate opinion is part of the record of conviction and may be relied on in deciding a section 1170.95 petition on the merits, so the trial judge did not err in doing so in this case. We also hold the trial judge sits as a fact finder at a hearing under section 1170.95, subdivision (d) and that substantial evidence supports the trial judge's finding beyond a reasonable doubt that Clements committed implied malice second degree murder. The trial judge correctly denied Clements' petition for resentencing for that reason.

After we issued our opinion, and while the case was pending review in the California Supreme Court, the Legislature passed and the Governor signed Senate Bill No. 775 (Stats. 2021, ch. 551), which amends section 1170.95 in a number of ways. (Sen. Bill No. 775 (2021-2022 Reg. Sess).) On December 22, 2021, the Supreme Court ordered us to vacate our opinion and reconsider the matter in view of these changes. We asked the parties to file supplemental briefs addressing the issues raised by the statutory changes. We conclude they reaffirm our interpretation of the standard that applies at a hearing under section 1170.95 and don't otherwise change our resolution of the case. We therefore again affirm the order of the trial court denying Clements' petition.

# I

## FACTS

A. *The Facts as Set Out in the Opinion from Clements' First Appeal*

The facts in this part of the opinion come directly from the unpublished opinion we issued in 1994, affirming Clements' conviction in case No. E008001.

In January 1988, Clements and her ex-husband located the victim at a juvenile facility in New Mexico. Clements and the victim, who were brother and sister, had been separated during childhood. The three traveled some and eventually settled in Texas, during which time sexual relations took place between Clements and the victim, and between all three at once. This caused fighting between Clements and her ex-husband, and Clements returned to California with the victim in late April or early May.

The relationship between Clements and the victim soured in California. After the murder, Clements admitted she had been envious because the minor victim received money from the social security system due to the death of their father and she, because of her majority, did not. Although Clements was, by May before the murder, having a sexual relationship with her new boyfriend, and was not interested in continuing to have sex with the victim, the latter did not share her feelings and resented her relationship with her boyfriend. According to Clements, the victim was taking drugs (although she also admitted supplying them to him), drinking, hot-rodding his car, and being abusive to her and her mother, all of which additionally upset her. Clements and the victim often argued, and two fights in particular erupted into physical confrontations, during one of

4

which Clements said to the victim, "I'll see you dead, you son of a bitch, and my friends will do it." At some point, Clements told a relative that she never hated anyone in her life as much as she hated the victim and she feared she would kill him if they got into another fight.

Clements' boyfriend testified at trial that Clements told him during this time that she wanted the victim dead. He stated that in late June, she called her ex-husband in Texas, reported to him her extreme unhappiness with the victim and asked him to come out and kill the victim. According to the boyfriend, Clements also asked him to help in the killing, after her ex-husband arrived in California and made clear his intention to proceed with the murder, and they discussed together the various ways this could be accomplished. The boyfriend stated that on July 5, after Clements' ex-husband had twice informed her that he and the boyfriend were going to kill the victim that night, the two men took the victim to a remote area of the desert, stabbed the victim and bludgeoned him with a rock, and buried him in a grave they had dug earlier in the day. Upon their return to Clements' home, the boyfriend testified, the ex-husband told her what they had done.

Clements' mother and her boyfriend's mother testified that Clements lied to the latter twice that night about the boyfriend's whereabouts. Clements' mother also testified that after the men left that night to get the victim, Clements told her that they had gone to kill the victim. Clements' mother confirmed the boyfriend's testimony that Clements was told about the killing when the men returned to the house. Clements, herself, admitted at

trial that she tried to wipe the victim's blood off her ex-husband's shoes and body, and she went with him twice in the days following the killing to destroy evidence. She also admitted that she and her mother took some of the victim's possessions when the men returned from the murder scene with them.

A relative testified that in the weeks following the killing, Clements and her ex-husband attempted to obtain the victim's social security checks, which were still coming because the body had not yet been discovered.

Months later, Clements admitted to her boyfriend's then new girlfriend that she and the boyfriend had killed the victim because she did not like him.

Clements testified in her own behalf and admitted complaining to her ex-husband about the victim, but she claimed she asked him only to beat the victim up and never intended or anticipated that the victim would be substantially harmed. She denied engaging in conversations about the victim's demise before the fateful day. She also denied knowing that her ex-husband and boyfriend had set out that day to kill the victim or even knowing that they had accomplished their task until the following day.

B. *Additional Trial Evidence Concerning Malice*

Though not recounted in the original appellate decision, the trial transcript contains testimony relevant to whether Clements had the intent necessary to sustain a conviction for second degree murder under an implied malice theory. Specifically, the testimony recounted in part B is relevant to whether Clements was aware soliciting her ex-husband (Earl) and her boyfriend (Michael) to assault her teenage brother (Jim) would

6

endanger the brother's life, and whether she acted in conscious disregard of that risk.

Clements admitted she had witnessed Earl's violent temperament firsthand on several occasions. She had seen him attack an ex-boyfriend unprovoked at least twice. She had also seen him hit her brother Jim. She recounted one occasion when the three of them were driving and Jim called her a bitch. Earl turned around and hit Jim, and the two started fighting. She pulled the car over, and ultimately Jim called the police. On another occasion she recounted, Clements stepped in between the two and tried to push Earl out of the house "because he was ranting and raving and tore the curtains down and he was – he was being awful."

Clements also admitted she was aware Earl was angry with Jim and had threatened to harm him. While they still lived in Texas, Earl and Clements had stopped seeing each other in part because of her relationship with Jim. She said Earl was angry with Jim over the breakup and had told her he was "going to get him, you know, for what he had done and stuff, and he says—okay. Earl felt like Jim had taken me away from him." At trial, Clements admitted she knew the tension between the two was mounting. She said Earl told her she had to choose between the two men, and she chose Jim.

After they moved to California, Clements and Jim started arguing and having problems. In June 1989, about a month before the murder, Earl called Clements at work and told her he was in trouble in Oklahoma because he had assaulted a man. He said the man "was in the hospital in a coma, that that guy was just hurt real bad and they had pretty good charges on him." Earl told her he fought the man because both were involved

7

with the same woman and "they didn't know if that guy was going to live or not." It was during that conversation that Clements first told Earl about the problems she was having with Jim. She said she thought he had "gotten out of hand," and she could no longer control his behavior. She asked Earl to come to California because she thought Earl could "straighten him out."

Earl told Clements he was already mad at Jim and he wanted to get back at him for the things he had done to them in Texas. He told her he was going to kill Jim and said he had wanted to kill him when they were in Texas, but he couldn't find a place to bury the body and he didn't think he could get away with it.[1] According to Clements, she responded, "Well I don't want you to kill him. Could you just beat him up?" Earl said "he was going to take care of it his way."

During her interview with detectives, Clements described a conversation she had with Earl's younger brother when she related her problems with Jim. "Well, Jim's not even going to be able to leave California and stuff like that. He's going to be stuck in the desert forever and suffer like this, you know, and I was kind of wondering if Earl had told him." She said he warned, "[Y]ou better watch out. This isn't the first time [he's] done this, you know." The detective asked Clements whether the brother meant this wasn't the first time Earl had killed someone. She said, "And – yeah. And I was a little worried about it, but not really because I didn't think he would ever hurt me, you know, but I don't know."

---

[1] The trial judge admitted this testimony for the purpose of proving Clements' state of mind.

After the first phone call with Earl, Clements and Jim got into a physical fight, and she told him, "I'll see you dead and my friends will do it." Clements and Earl then spoke on the phone a second time. She told him about the fight, and he "cuss[ed] Jim really bad," and said he was "going to get him." Referring to Jim, Earl said, "That son [of] a bitch just crossed me. [¶] . . . [¶] And he shouldn't of crossed me and he shouldn't hurt you because I told him not to ever hurt you."

Once Earl arrived in California, he kept his car hidden from view. Clements explained he did this "because he didn't want anyone to know he was there because he was going to kill Jim." Clements said she asked Earl why he thought he had to kill her brother and again asked him to "straighten [Jim] up" by beating him up. Later, she overheard Earl and Michael discussing Jim and how angry at him they were. She heard Earl ask, "[A]re you going to help me get rid of Jim?" Michael responded, "are you really serious about this?" Earl replied, "I'm serious about this."

On the day of the murder, Earl and Michael were gone for several hours. When they returned, they told Clements they had been digging a trench in the desert. That evening, as Earl was leaving to get Jim, Clements said she told him not to kill her brother. As she explained during her testimony, "I think it was that day I told him. Because when he said he was going to go get him I was thinking about what he told me on the phone and stuff, but I didn't—I just told him not to do that. [¶] I just told him not to kill him because I didn't think he would."

9

While the two were out committing the murder, Clements told her mother she was worried they were going to kill Jim and admitted she was worried about him. Her mother testified Clements told her outright that Earl had gone to kill her brother, not that she was worried that would happen.

C. *Jury Instructions and Conviction*

In 1989, Clements was charged generally with murder for her involvement in the killing. The trial judge instructed the jury on several theories of murder liability. First, the judge instructed the jury on second degree implied malice murder, telling them that crime is the unlawful killing of a human being when: "1) the killing resulted from an intentional act, 2) the natural consequences of the act are dangerous to human life, and 3) the act was deliberately performed with knowledge of the danger to, and conscious disregard for, human life." The judge also instructed the jury Clements was guilty of murder if she caused the victim's death, "as a natural and probable consequence of a request to commit a felony inherently dangerous to human life," and that the felony could include aggravated assault.

The jury acquitted Clements of first degree murder but convicted her of second degree murder. Clements appealed on grounds different from the issues now on appeal and this court affirmed her conviction.

D. *Clements' 1170.95 Petition*

In January 2019, Clements filed a petition under newly enacted Penal Code section 1170.95, which, among other things, allows people convicted of second degree

10

murder under the natural and probable consequences doctrine to seek to vacate their convictions and seek resentencing for the underlying offense. The trial judge appointed counsel for Clements and ordered the parties to submit briefing on her eligibility for relief. After briefing, the parties and the trial judge agreed Clements had made a prima facie showing of eligibility, and the judge ordered an evidentiary hearing.

The trial judge held the hearing on July 25, 2019. Though section 1170.95 specifically allows the introduction of new or additional evidence, the parties agreed they would not introduce such evidence. With Clements' agreement, the People submitted the record of conviction, including trial transcripts, to the court. No one testified. The parties disagreed whether the trial judge should rely on the statement of facts from our prior opinion, recounted in part I.A. above. The trial judge then took the case under submission.

On September 30, 2019, the trial judge denied Clements' petition in a written opinion. He concluded the prior opinion of this court is part of the record of conviction and it was proper for him to consider the factual history set out in the opinion to the extent it was relevant. The judge noted the parties agreed Clements satisfies the first two conditions on eligibility under section 1170.95 and that the only issue is whether "[t]he petitioner could not be convicted of first or second degree murder because of the changes to Section 188 or 189" effected by passage of SB 1437.

The trial judge determined, "based on the record of conviction properly before the court, [that] the People have met their burden of establishing the fact that defendant is ineligible for resentencing because she 'could . . . be' convicted of second degree murder for the death of [her brother Jim], notwithstanding changes to Penal Code Section 188 or 189 made effective January 1, 2019." The trial judge recognized a vagueness in section 1170.95 about the nature of the judge's role in making that determination and for that reason issued alternative holdings.

First, the trial judge held the People had established the evidence in the record was, as a legal matter, sufficient to uphold a conviction for second degree murder under a still-valid implied malice theory. "In the court's view, the newly-enacted statute does not entitle the defendant to a plenary re-trial on the charge of second degree murder of which she stands convicted. Rather, the issue for the court for decision, when an order to show cause is issued and a hearing is held, is whether the People can prove, beyond a reasonable doubt, that the petitioner 'could . . . be' convicted of second degree murder under the current law of murder. That presents to the court a legal question, that is, the issue of the legal sufficiency of the evidence before the court to sustain the defendant's conviction for one count of murder in the second degree, under the current law of murder, as set forth in the Penal Code sections 188 and 189, as recently amended." The court held the record of conviction "conclusively establishes an ample and legal sufficient basis to sustain, under the law of murder as currently formulated, the prior court's verdict, finding the defendant guilty of one count of murder in the second degree."

12

Second, the judge, sitting as a fact finder, determined the evidence in the record of conviction proved beyond a reasonable doubt that Clements was guilty of second degree murder, notwithstanding the change to the law. "Alternatively, the statute may be read as allowing the defendant what amounts to a retrial on the issue of murder, where the court sits as the trier-of-fact, and the evidence is the record of conviction in the case, as supplemented by any new or additional evidence adduced at the hearing on the petition. Under this theory, the court puts itself in the place of the jury, determining whether the People have proven the defendant is guilty of murder in the second degree, based on the evidence before it. Applying this theory, the court, sitting as the trier-of-fact, based on the evidence before it, and fully advised of the requirements of the law of murder as currently formulated, hereby finds that the People have proven the defendant guilty of one count of murder arising out of the death of [Clements' brother], in the second degree."

Clements filed a timely notice of appeal.

## II

## ANALYSIS

Clements challenges the sufficiency of the evidence that she acted with implied malice required to establish second degree murder. Along the way, she argues the trial judge erred by considering the facts as set out in our opinion in her direct appeal and by conducting a substantial evidence review of the trial record. She argues section 1170.95 requires the judge to make an independent factual finding whether Clements would have been convicted of second degree murder even if the jury hadn't been instructed on the

13

natural and probable consequences doctrine. She also argues the record shows reasonable doubt as to whether she acted with implied malice. That means, she says, she is entitled to be resentenced under section 1170.95.

A. *Senate Bill No. 1437*

"Generally, malice is an essential element of the crime of murder. (§ 187.) Malice may be either express or implied. It is express 'when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature.' (§ 188, subd. (a)(1).) It is implied 'when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.' (*Id*., subd. (a)(2).) Implied malice has "'both a physical and a mental component. The physical component is satisfied by the performance of 'an act, the natural consequences of which are dangerous to life.' . . . The mental component is the requirement that the defendant 'knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life."'" (*People v. Johns* (2020) 50 Cal.App.5th 46, 57.)

Before S.B. 1437, the natural and probable consequences doctrine was an exception to the actual malice requirement. The doctrine made "a person who aids and abets a confederate in the commission of a criminal act . . . liable not only for that crime (the target crime), but also for any other offense (nontarget crime) [including murder] committed by the confederate as a 'natural and probable consequence' of the crime originally aided and abetted." (*People v. Prettyman* (1996) 14 Cal.4th 248, 254, 262-263.) Because a nontarget murder "is unintended, the mens rea of the aider and abettor

14

with respect to that offense is irrelevant and culpability is imposed simply because a reasonable person could have foreseen the commission of the [murder]." (*People v. Chiu* (2014) 59 Cal.4th 155, 164.) For that reason, our Supreme Court held "punishment for second degree murder," rather than first degree murder, "is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine." (*Id.* at p. 166.)

Effective January 1, 2019, the Legislature changed the substantive definition of murder by enacting SB 1437. The new law was designed "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (SB 1437, § 1.) Relevant to this case, SB 1437 eliminated the exception that had allowed a second degree murder conviction under the natural and probable consequences doctrine. As amended, Penal Code section 188 directs malice may not "be imputed to a person based solely on his or her participation in a crime." (Pen. Code, § 188, subd. (a)(3).) Instead, "to be convicted of murder, a principal in a crime shall act with malice." (*Ibid.*)

The Legislature also added section 1170.95 to the Penal Code, which creates a procedure for offenders previously convicted of murder under a natural and probable consequences theory to obtain the benefits of these changes retrospectively. Convicts may petition for relief in the court where they were sentenced if (1) the complaint or

15

information filed against them "allowed the prosecution to proceed . . . under the natural and probable consequences doctrine," (2) they were "convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder", and (3) they "could not be convicted of first or second degree murder because of changes to Section 188 or 189." (§ 1170.95, subd. (a).) If a petitioner makes a prima facie showing that they're entitled to relief, the judge must issue an order to show cause and hold "a hearing to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not . . . previously been sentenced." (§ 1170.95, subds. (c), (d)(1).)

At the hearing "to determine whether the petitioner is entitled to relief, the burden shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3).) Both parties "may rely on the record of conviction or offer new or additional evidence to meet their respective burdens." (*Ibid*.) As we've seen, in this case, both parties chose to rely on the record of conviction. "If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (*Ibid.*) If the trial judge determines the "petitioner is entitled to relief, [and] murder was charged generically, and the target offense was not charged, the petitioner's conviction shall be redesignated as the target offense or underlying felony for resentencing purposes." (*Id.*, subd. (e).)

16

Clements' appeal implicates the question whether the People sustained their burden of proving beyond a reasonable doubt that she was not entitled to relief because the record of conviction shows she acted with implied malice.

B. *Consideration of the Appellate Opinion on Direct Review*

Clements argues the trial judge erred when he ruled this court's opinion in her direct appeal was part of the record of conviction and could be considered in determining whether she was entitled to relief.

In *People v. Woodell* (1998) 17 Cal.4th 448, our Supreme Court held an appellate opinion is generally "part of the record of conviction that the trier of fact may consider in determining whether a conviction qualifies under the sentencing scheme at issue." (*Id.* at p. 457.) It's true that when introduced at trial to prove the defendant's conduct, the contents of an appellate court opinion are subject to the ordinary rules regarding the admission of hearsay. (*Id.* at pp. 457-458; see also *Lockley v. Law Office of Cantrell, Green, Pekich, Cruz & McCort* (2001) 91 Cal.App.4th 875, 885.) However, in posttrial proceedings, statements from prior appellate opinions are admissible as reliable hearsay even if they would not be admissible at trial. (See *People v. Guilford* (2014) 228 Cal.App.4th 651, 660 [Proposition 36 proceedings].)

It's a separate question "[w]hether and to what extent an opinion is probative in a specific case." (*People v. Woodell*, *supra*, 17 Cal.4th at p. 457.) It's easy to conceive of a case where the issues on appeal implicate different facts than a later resentencing petition. For example, a defendant convicted of natural and probable consequences murder with a

17

gang enhancement may have challenged only the gang enhancement on direct appeal because the evidence of the murder was, under prior law, very strong. The original appellate decision in such a case may focus on facts not relevant to a later petition challenging the murder conviction. (See, e.g., *People v. Langi* (2022) 73 Cal.App.5th 972, 980 ["Despite the statement in our prior opinion that appellant threw the punch leading to the victim's death, for which the record does include evidence, the record as a whole leaves room to question that conclusion. . . . That question was not critical to the resolution of the appeal; the critical question was whether it was reasonably likely that Faasolo's improperly excluded testimony would have led to a different outcome at trial"].) Here, the trial judge properly noted that possibility and limited its consideration to only the "relevant and admissible evidence in the record of conviction."

At the time of the hearing, section 1170.95, subdivision (d)(3) allowed "[t]he prosecutor and the petitioner [to] rely on the record of conviction or offer new or additional evidence to meet their respective burdens" at the evidentiary hearing. The trial court was justified in presuming the Legislature was aware of the precedent holding an appellate decision is part of the record of conviction admissible in posttrial proceedings when they enacted section 1170.95 and intended to allow trial judges to consider prior appellate opinions in deciding after a hearing whether 1170.95 petitioners are eligible for relief. (See *In re W.B.* (2012) 55 Cal.4th 30, 57.) However, effective January 1, 2022, the Legislature limited use of prior appellate opinions, allowing trial judges to "consider the procedural history of the case recited." (§ 1170.95, subd. (d)(3), as amended by Stats.

18

2021, ch. 551.) Though the parties don't mention this change in their supplemental briefing, its specificity indicates the Legislature has decided trial judges should not rely on the factual summaries contained in prior appellate decisions when a section 1170.95 petition reaches the stage of a full-fledged evidentiary hearing.

In any event, Clements has not identified any portion of our prior opinion that the trial judge relied upon, so she's provided no basis for overturning the trial judge's ruling on the ground that it reached its ultimate conclusion that she was not entitled to relief based on information in our prior opinion rather than information in the trial transcripts the parties submitted for the trial court's decisions. (*Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 766 ["It is the appellant's burden to demonstrate the existence of reversible error"].) As far as we can discern, the trial judge admitted the prior appellate opinion, but did not rely on it. We have reviewed the trial transcripts and conclude they support the factual history set out in our prior opinion, and our analysis depends on the trial transcript rather than the partial summary contained in our prior opinion.

C. *The Trial Judge's Role as Fact Finder*

As we noted above, the trial judge first considered the legal issue of whether the record of conviction contained substantial evidence to support the murder conviction on a theory other than the natural and probable consequence doctrine and concluded it did provide a sufficient basis to sustain the verdict. Clements argues it was error to use a substantial evidence standard to assess her eligibility for relief. This is a question of statutory construction which we review de novo. (*People v. Gonzalez* (2017) 2 Cal.5th

19

1138, 1141.) It's also a question of first impression in our appellate district and a matter of disagreement in the other district Courts of Appeal. (*People v. Rodriguez* (2020) 58 Cal.App.5th 227 (*Rodriguez*) [error to use substantial evidence standard at a section 1170.95, subd. (d)(3) hearing]; *People v. Lopez* (2020) 56 Cal.App.5th 936 [same]; *People v. Duke* (2020) 55 Cal.App.5th 113, review granted Jan. 13, 2021, S265309 [holding substantial evidence standard applies at a section 1170.95, subd. (d)(3) hearing].)

Under section 1170.95, subdivision (a), defendants convicted under a natural and probable consequences theory may file a petition for resentencing if they were charged in a way that allowed the prosecution to proceed under the natural and probable consequences doctrine, were convicted or pled guilty to first degree or second degree murder, and "could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a)(1)-(a)(3).) Here, it's established that Clements was charged with murder generally, convicted of second degree murder, and her jury was instructed on a natural and probable consequences theory. So, Clements made a prima facie showing of eligibility under section 1170.95, subdivision (a), and the trial judge properly ordered a hearing to determine whether she is entitled to relief under section 1170.95, subdivision (d).

Once the petitioner has made a prima facie showing for relief and the court issues an order to show cause, the trial judge must "hold a hearing to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on

20

any remaining counts in the same manner as if the petitioner had not been previously been sentenced."[2] (§ 1170.95, subd. (d)(1).) The parties may waive the hearing if they agree the petitioner should be resentenced under the new law. (§ 1170.95, subd. (d)(2).) If the People don't agree to resentencing, the petitioner is entitled to a "hearing to determine whether the petitioner is entitled to relief." (§ 1170.95, subd. (d)(3).)

At that point, the statute shifts the burden to the People. The Legislature specified "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3).) To sustain their burden, the People may rely on the record of conviction "or offer new or additional evidence." (*Ibid.*) The judge must determine whether the People sustained their burden of proof, and if they have not done so it directs "the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (*Ibid.*)

Thus, taken together, the People had the burden to prove the record of conviction and any new or additional evidence the parties submit establish beyond a reasonable doubt that Clements committed murder under the amended law. (§ 1170.95, subd. (d)(3).) The trial judge concluded this inquiry "presents to the court a legal question, that is, the issue of the legal sufficiency of the evidence before the court to sustain the defendant's conviction for one count of murder in the second degree."

---

[2] The statute bars the trial judge from imposing a sentence greater than the original sentence. (§ 1170.95, subd. (d)(1).)

We disagree with the trial judge's construction of the statute. The question is whether the petitioner committed murder under a still-valid theory, and that is a factual question. The Legislature made this clear by explicitly holding the People to the beyond a reasonable doubt evidentiary standard and by permitting the parties to submit new or additional evidence at the hearing on eligibility. (§ 1170.95, subd. (d)(3).) Reading the statute to require the trial judge to decide only whether substantial evidence supports a conviction under a still-valid theory would undercut that explicit requirement. The substantial evidence test asks only "whether substantial evidence supports the conclusion of the trier of fact, *not whether the evidence proves* essential facts beyond a reasonable doubt, or by clear and convincing evidence." (*In re Joseph E.* (1981) 124 Cal.App.3d 653, 661, italics added.) By contrast, a fact finder tasked with holding the People to the beyond a reasonable doubt standard, "must impartially compare and consider all the evidence that was received throughout the entire trial" and determine whether that "proof . . . leaves you with an abiding conviction that the charge is true." (CALCRIM No. 220; see also Pen. Code, § 1096 [reasonable doubt "is that state of the case, which, after the *entire comparison and consideration of all the evidence*, leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge"], italics added.) We presume the Legislature was aware of this distinction when they enacted section 1170.95, and therefore conclude the plain text of the statute requires the trial judge to sit as a fact finder, not as a quasi-appellate court.

22

Indeed, because the substantial evidence inquiry strips the standard of proof from the reviewing court's analysis, interpreting the statute as directing trial judges to sit as quasi-appellate courts would effectively read the standard of proof out of the provision. The statute is too clear that the People must prove the petitioner is not entitled to relief beyond a reasonable doubt for that interpretation to be correct. "It is a maxim of statutory interpretation that courts should give meaning to every word of a statute and should avoid constructions that would render any word or provision surplusage." (*Tuolumne Jobs & Small Bus. Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1038.) If the Legislature had intended trial judges to review the record of conviction and grant relief only in an absence of substantial evidence to support a still-valid theory, they knew how to enact that standard and would have done so explicitly. (See *Tex-Cal Land Management., Inc. v. Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335, 346 [upholding Legislature's choice to "accord finality to the findings of a statewide agency that are *supported by substantial evidence on the record considered as a whole*" rather than require independent judgment review], italics added; *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 515 ["If the Legislature had desired otherwise, it could have declared as a possible basis for issuing mandamus the absence of substantial evidence to support the administrative agency's action"].)

The trial judge and the People analogize the trial judge's task with a substantial evidence review on the basis of the statute's use of the word "could" in subdivision (a). They argue that if Clements is eligible only if she "could not be convicted," then the

23

People were required to prove only that she "could be convicted" under current law. That is, the People must prove a counterfactual—that it's possible a jury would convict her—which they can do by establishing there's sufficient evidence for a jury instructed under current law to conclude she is guilty of second degree murder. In other words, if there is substantial evidence to support a murder conviction under a still-valid theory, Clements *could* still be convicted of murder under the amended law, and thus she is ineligible for relief.

While we recognize the appeal of the interpretation, we think it puts too much emphasis on the mood of a verb in subdivision (a). That provision concerns what it takes to make a prima facie showing, not establishing ultimate entitlement to relief. It's natural to use a verb mood focusing on whether it's *possible* the petitioner wouldn't have been convicted of murder if tried under the amended law at the stage where the court is deciding whether to hold a hearing on resentencing. It doesn't follow that, at that ultimate hearing, the People can show the petitioner shouldn't get relief by arguing the conviction was simply *possible*. That interpretation extends the hypothetical nature of the inquiry from the prima facie stage to the hearing stage. As our sister court has explained, "Use of a conditional verb in section 1170.95, subdivision (a)(3), is a normal grammatical construct to express the hypothetical situation an inmate . . . faces when filing [a] petition—what would happen today if he or she were tried under the new provisions of the Penal Code? [Citation.] But once a prima facie case of eligibility has been made and an order to show cause issued, the prosecution's burden is neither conditional nor

24

hypothetical. Under subdivision (d)(3) the prosecutor must prove 'the petitioner is ineligible for resentencing,' not that he or she might be or could be ineligible." (*Rodriguez*, *supra*, 58 Cal.App.5th at p. 241.)

When interpreting the statute, we must attend to the Legislatures' clear purpose in subdivision (d) of requiring a fact finding at the ultimate hearing on the merits. Subdivision (d) specifies the purpose of the hearing is "to determine whether the petitioner is entitled to relief" and places "the burden of proof . . . on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." This plain language shows the People are required to establish the defendant is guilty under current law *as a matter of fact* and beyond a reasonable doubt. (See *Rodriguez*, *supra*, 58 Cal.App.5th at p. 241 ["[The] legislative goal is best effectuated by resentencing individuals convicted of . . . second degree murder under the natural and probable consequences doctrine . . . whether from the record of conviction alone or with new and additional evidence introduced at the subdivision (d)(3) hearing, fails to establish beyond a reasonable doubt they, in fact, acted during the crime with the now-required mental state"].) Applied to this case, the judge was required to determine whether the People satisfied their burden of proving beyond a reasonable doubt that Clements committed implied malice murder based on the evidence contained in the record of conviction.

The People's interpretation of the statute also has the demerit of leaving completely obscure what the trial judge would be asked to do in a case where there is a trial transcript *and* new live testimony. The statute is explicit that either party "may rely

25

on the record of conviction or offer new or additional evidence to meet their respective burdens." (§ 1170.95, subd. (d)(3).) Under our interpretation, the judge simply reviews the record, hears the testimony, and decides as a factual matter whether the petitioner committed murder under the current law. (*Rodriguez*, *supra*, 58 Cal.App.5th at p. 242 ["How is the superior court to evaluate that additional evidence if not as an independent factfinder? It would be pointless for the court's role in this situation simply to be deciding whether a jury *could* credit a new witness's testimony and thus *could* conclude the petitioner had acted with express malice"].)

It's true that it's unusual to ask the trial judge to sit as the fact finder and (in some cases) make factual determinations on a cold record, as the judge did in this case. While that is not the ideal position for a fact finder, it is possible to review a trial transcript and reach an opinion about what actually happened. The Legislature landed on that compromise as a way of extending the ameliorative benefits of its redefinition of murder to people previously convicted under prior law, which they judged to be too harsh. They could have directed that qualifying offenders receive a new trial by a new jury on the critical factual questions. But that was impractical for many reasons; the expense would have been enormous and the chances of obtaining live testimony from witnesses who remembered the events from years or decades earlier is small. The Legislature also could have simply refused to make the benefits of the new law available to people already validly convicted under the old law. They chose the middle course of requiring trial judges to decide the critical factual questions based—at least in some cases—on a cold

26

record. While the Legislature's compromise is not perfect, it is adequate. And if either party believes it's important to put on live testimony to allow the trial judge to make credibility determinations based on cues other than consistency and plausibility, the statute expressly allows them that opportunity.

After we issued our opinion, the Legislature confirmed our view by amending section 1170.95. The amended provision now specifies that "[a] finding that there is substantial evidence to support a conviction for murder . . . is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3), as amended by Stats. 2021, ch. 551.)

We therefore conclude the trial judge erred to the extent it based its conclusion that Clements was not eligible for resentencing on the ground that substantial evidence in the record of conviction supported finding her guilty of second degree murder under an implied malice theory. That conclusion doesn't end our inquiry, however, because the trial judge held Clements isn't eligible for resentencing on the alternative ground that she was *in fact* guilty of second degree murder.

D. *Sufficiency of the Evidence to Support the Trial Judge's Factual Finding*

Recognizing we might interpret the statute to require it to sit as the trier-of-fact, the trial judge added a belt to its suspenders and found "the People have proven the defendant guilty of one count of murder arising out of the death of [Clements' brother], in the second degree." Clements argues this conclusion was erroneous because the record shows a reasonable doubt as to her guilt on the second degree murder charge under an

implied malice theory.

We review the trial judge's fact finding for substantial evidence. (*People v. Gregerson* (2011) 202 Cal.App.4th 306, 320.) We '"examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence— that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt."' (*People v. San Nicolas* (2004) 34 Cal.4th 614, 657-658.) Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt. (*Ibid.*)

Of course, in a section 1170.95 petition, the trial judge isn't charged with holding a whole new trial on all the elements of murder. Instead, the parties will focus on evidence made relevant by the amendments to the substantive definition of murder. Senate Bill No. 1437 amended section 188 to require the prosecution to prove that all principals to a murder acted with malice aforethought. (§ 188, subd. (a)(3).) Though this change abolished the natural and probable consequences doctrine, it maintained the viability of murder convictions based on implied malice, and the definition of implied malice remains unchanged. (§ 188.) In this case, the elimination of the natural and probable consequences doctrine raises the question whether the evidence supports a

28

second degree murder verdict under an implied malice theory. The trial judge found that the evidence does support that verdict, and we conclude there is sufficient evidence in the record of conviction, including Clements' own testimony, to support the finding that she acted with conscious disregard for her brother's life, and thus harbored implied malice.

Second degree murder is "the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder." (*People v. Knoller* (2007) 41 Cal.4th 139, 151.) Malice may be either express, i.e. when a defendant manifests an intention to kill, or implied. (*People v. Blakeley* (2000) 23 Cal.4th 82, 87.) "'Malice is implied when the killing is proximately caused by 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.''" (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) Thus, implied malice includes an objective component—an act that is dangerous to life—and a subjective component—the defendant's awareness of and disregard for the danger. (*People v. Knoller*, at pp. 153-154, 157.)

For implied malice in this case, the critical question is whether substantial evidence in the record of conviction shows Clements' act of requesting and coordinating the assault on her brother was deliberate and performed with knowledge of the danger to, and conscious disregard for, his life. Though the trial judge instructed the jury on this element of implied malice, they weren't required to find she acted in this way to convict

29

her under a natural and probable consequences theory. So, the trial judge's eligibility determination hinges on the third element.

Clements' own trial testimony provided substantial evidence that she acted deliberately and with a conscious disregard for life. She was aware recruiting Earl and Michael to assault Jim was going to endanger Jim's life, and she acted anyway, knowing the risk. First, it was basically uncontested that she solicited Earl to assault Jim. She told Earl about the problems she was having with Jim on their June 1989 call and asked him to come to California because she thought he could "teach him a lesson," and "put his foot down." She acknowledged she asked Earl to "straighten [Jim] out" by "disciplining" him and that Earl said he was going to kill Jim. She also acknowledged he said he had wanted to kill Jim in Texas, but he didn't think he could get away with it. The best she could say for herself is she responded, "Well, I don't want you to kill him. Could you just beat him up?" But Earl told her "he was going to take care of it his way."

Second, there was substantial evidence she understood the risk of her solicitation. She was familiar with Earl's violent temperament and proclivity for violence, including deadly violence. She had seen Earl attack an ex-boyfriend twice unprovoked. In June 1989, about a month before the murder, Earl called Clements at work and told her he was in trouble in Oklahoma because he had assaulted a man so badly he was in a coma and at risk of dying. More, Clements told police Earl's brother had warned her about asking Earl to discipline Jim, saying "You better watch out. This isn't the first time Earl's done this, you know." The police asked whether he meant this wasn't the first time Earl had killed

someone, and Clements responded yes. She was also aware Earl was angry with Jim and blamed him for their breakup. At trial, Clements admitted she knew the tension between the two was mounting.

After the June phone call, Clements and Jim got into a fight, during which she said to him, "I'll see you dead, and my friends will do it." Afterward, Clements spoke to Earl on the phone a second time. She told him about the fight and he "cuss[ed] Jim really bad," and said he was "going to get him." Earl said, "That son [of] a bitch just crossed me. [¶] . . . [¶] And he shouldn't of crossed me and he shouldn't hurt you because I told him not to ever hurt you." Earl said he had warned Jim that if Jim ever crossed him or Clements, "he was going to have to pay for it."

Once Earl arrived in California, it became clear Earl intended to kill Jim. He again told Clements as much. He kept his car hidden from view, and Clements explained it was because he didn't want anyone to know he was there because he was going to kill Jim. Later, Clements overheard Earl and Michael discussing how angry they were at Jim, and she heard Earl ask Michael for help killing Jim. Earl asked Michael, "are you going to help me get rid of Jim?" Michael responded, "are you really serious about this?" Earl replied, "I'm serious about this." Both Earl's statements and his actions therefore communicated to Clements that he was serious about his threat to kill Jim.

On the day of the murder, Earl and Michael were gone for several hours, and when they returned, they told Clements they had been digging a trench in the desert. That evening, as Earl was leaving, Clements said she told Earl not to kill Jim. As she

31

explained it during her testimony, "I think it was that day that I told him [not to kill Jim]. Because when he said he was going to go get him I was thinking about what he told me on the phone and stuff, but I didn't – I just told him not to do that. I just told him not to kill him because I didn't think he would." This comment shows Clements continued facilitating the assault despite being aware of the risk Jim would be killed. Indeed, while Earl and Michael were out committing the murder, Clements said she told her mother she was worried they were going to kill Jim. Her mother testified too, and said Clements actually told her they had gone to kill Jim, not that she was worried that was what was happening. Under either version, Clements was consciously aware that Jim's life was in danger due to the assault she solicited.

We conclude this evidence—including Clements' own testimony trying to minimize her culpability—provides a more than adequate basis for the trial judge's finding beyond a reasonable doubt that she was aware recruiting Earl to commit an aggravated assault of Jim endangered Jim's life and that she acted in conscious disregard of that risk. On that basis, we affirm the order denying Clements' section 1170.95 petition for resentencing.

Clements argues the recent amendment of section 1170.95 raises new questions about this conclusion. She is correct that Senate Bill No. 775 expanded the scope of section 1170.95 from petitioners "convicted of felony murder or murder under the natural and probable consequences doctrine" to petitioners convicted under any "other theory under which malice is imputed to a person based solely on that person's participation in a

crime." (§ 1170.95, subd. (a) as amended by Stats. 2021, ch. 551, § 2.) However, we disagree with Clements' attempt to present herself as a person convicted of implied malice based solely on her participation in a crime. On the contrary, Clements was an active participant in the solicitation and planning of the assault and the evidence, including her own testimony, establishes she acted with conscious disregard for human life.

The recent case of *People v. Langi* illustrates the circumstances when the new language applies. In that case, the defendant was part of a group who accosted the victim with the purpose of robbing him. The confrontation ended in a fist fight, and the victim was killed by a blow to the head suffered after he was punched by one member of the group. (*People v. Langi*, *supra*, 73 Cal.App.5th at p. 975.) Langi argued the jury could have found him "guilty of murder if it found that (1) the killing resulted from the actual killer's intentional act; (2) appellant aided and abetted that intentional act; and (3) the killer 'deliberately performed [the act] with knowledge of the danger to, and with conscious disregard for, human life'—whether or not *appellant* knew of or consciously disregarded the danger to human life." (*Id.* at p. 981.) He argued "[t]he instructions thus permitted the jury to impute malice to appellant based solely on his participation in a crime, without having to find that he personally acted with malice." (*Ibid.*) In other words, he argued the aiding and abetting instructions allowed the jury to convict him under a vicarious felony murder theory no longer permitted under the amended definition of murder. The Court of Appeal agreed and remanded to the trial court for a hearing on

whether Langi could be convicted under the amended definition of murder. (*Id.* at p. 984.)

This case is different. As we've explained, there was significant evidence that Clements personally acted with knowledge of the danger to, and conscious disregard for, the life of her brother.

## III

## DISPOSITION

We affirm the order denying Clements' section 1170.95 petition.

CERTIFIED FOR PUBLICATION

SLOUGH_____

J.

We concur:

CODRINGTON_____

       Acting P. J.

FIELDS_____

       J.